## THE BERKLEY.

### TURLINGTON v. NEW YORK, P. & N. R. CO.

(District Court, E. D. Virginia. February 25, 1921.)

No. 2743.

**1. Collision ☞95(7)—Steamship and tow; mutual faults.**

A tug passing down Elizabeth river with a car float in tow, which by reason of meeting and passing a similar tow of the same owner, each using a hawser 600 feet long, in violation of the harbor rules and regulations established pursuant to Act May 28, 1908 (Comp. St. § 7969), unduly obstructed the channel, *held* primarily in fault for a collision between her tow and a steamship entering the channel from the side; and the steamship also *held* in fault for approaching and entering the channel from the anchorage grounds, where her view was obstructed, at such speed that she could not quickly control her movements.

**2. Collision ☞6—Rules not permanently suspended by War Regulations.**

War regulations cannot excuse violation of statutory rules and regulations governing the length of tows as applied to commercial operations more than a year after the signing of the armistice.

In Admiralty. Suit for collision by J. E. Turlington, master of the Steamship Berkley, against the New York, Philadelphia & Norfolk Railroad Company. Decree dividing damages.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward R. Baird, Jr., George M. Lanning, Baird, White & Lanning, all of Norfolk, Va., J. H. Turnure, of White Plains, N. Y., and Burlingham, Veeder, Masten & Fearey, of New York City, for libelant.

Thomas H. Willcox, Willcox, Cooke & Willcox, Braden Vandeventer, and Hughes, Vandeventer & Eggleston, all of Norfolk, Va., for respondent.

WADDILL, District Judge. The collision, the subject of this litigation, occurred in the channel of the Elizabeth river, Norfolk, Va., about opposite the Virginian Railway Piers, and in the immediate vicinity of buoy No. 8, at 6:45 o'clock on the morning of November 25, 1919, between the steamship Berkley, one of the line steamers of the Old Dominion Steamship Company, plying between Richmond and Norfolk, and car float No. 9, in tow of the tug Parksley, one of the line barges operated by the New York, Philadelphia & Norfolk Railroad Company, between Norfolk and Cape Charles, Va., en route to Cape Charles. Both vessels in collision were injured, the Berkley quite seriously, by her starboard quarter colliding with the starboard bow of the car float. The evidence, as respects the more material facts and circumstances bearing upon the collision, is less in dispute than usual, and the case turns almost entirely upon whether, at the time of the collision, the respondent's tows were unduly obstructing the navigable channel of the river, at and about the time of the collision, and whether the Berkley was being navigated with the degree of care and caution reasonably to be expected of her under the circumstances in which she was placed.

[1] The court's conclusion, upon full consideration of the testimony, is that both vessels were at fault for the collision. The Berkley claims that in coming across the flats from Newport News it was necessary to pass through the recently established anchorage grounds at that location, and which at the time were crowded with shipping that obstructed the view of her navigators of vessels passing up and down the Elizabeth river; that on the occasion in question, not only was her observation interfered with, but her view of the down-coming car float, with which she subsequently collided, was obscured by the presence of another car float of the respondent, then ascending the river, parallel with the down-going car float, in tow of another of respondent's tugs, the two tugs and tows occupying approximately 2,000 feet in length of the channel, and that the descending car float, after emerging from behind the up-going tug and tow, was not observed until it was too late to escape collision. The channel was undoubtedly obstructed by the unusual length of the tows, and that this condition contributed to the disaster there can be no serious question. Each tow was approximately 1,000 feet long, the hawsers each being from 90 to 95 fathoms, and the car floats were either in the act of passing, or had just passed each other, when the collision occurred.

By reason of the size and length of the tug and barge, considerable space was taken in the channel, and when to that was added the operation of the same in the crowded location in question, on approximately a 600-foot hawser, and further accentuated by one tow going in one

direction and the other in another, it resulted in the occupancy of virtually the entire channel for a distance of 2,000 feet. The hawsers to both tows were of unusual length, maintained in open violation, not only of the oft-repeated decisions of this court, affirmed by the Circuit Court of Appeals of this circuit, and by the Supreme Court of the United States, but in further violation of the Harbor Rules and Regulations, and the Regulation of the Secretary of the Treasury of December 7, 1908, prescribing the length of sea-going barges in inland waters (Comp. St. § 7969), which necessarily resulted in menace to other vessels using the harbor. The Harbor Rules (section 18) prescribe that "no tows exceeding 700 feet in length shall enter or depart from the harbor." The Jamestown (D. C.) 114 Fed. 593; The Georgetown (D. C.) 135 Fed. 854; The Hamilton (D. C.) 212 Fed. 1016; The Delmar (Wilkins' Adm'x v. N. Y., P. & N. R. R. Co.) 248 Fed. 826, key-note 1, affirmed 257 Fed. 42, 168 C. C. A. 254. These rules make obligatory the shortening of hawsers, and the necessity therefor was manifest in the particular locality, by reason of the crowded condition. Prudence and foresight would indicate the propriety of operating tows of reasonable length, and those violating the lawful requirements imposed upon them so to do are burdened with showing, not only that their acts of omission did not add to the happening of the accident, but could not have done so.

[2] Counsel suggest that the harbor rules were suspended as a result of certain legislation of the war period, referring particularly to the Regulation of the Secretary of Commerce of the 4th of June, 1917. This position, in the view of the court, is untenable, as certainly, for peaceful pursuits of the character involved here, the war should be considered as already ended, the collision having occurred more than a year after the signing of the armistice; and, in any event, the respondent should not avail itself of that position, for the reason that those navigating the respondent's tugs admit that they did not observe the regulations at any time, and, indeed, denied that they had ever been advised or informed of the existence of such rules, or that there was any limitation to the length of hawsers to be used by them.

While, in the judgment of the court, the length of the hawser in question entered into this accident, and of itself may have been the cause of the collision, still it cannot be said that the Berkley was free from fault in her navigation, which fault contributed to the accident. It is true that the view of the navigators of the Berkley was obstructed, and her course considerably impeded, in passing through and over the much frequented anchorage grounds, before entering the Elizabeth river; but knowing that she was suddenly to emerge through the anchored vessels into the channel, at approximately right angles to the channel, they should have exercised a higher degree of care and caution than they did in approaching and entering the channel, with a view of avoiding shipping passing up and down therein. They should not have taken the chance of altering her course to ascend the channel at the speed at which she came into it, but, on the contrary, should have slowed down earlier, so as to have been the better able to control her

movements. It was doubtless the length.of the hawser—that is, the distance between the tug and car float—that misled them, in realizing how little room she had to navigate to the westward of the channel. They should not have taken this chance; she ought to have gone into the channel at such speed as without difficulty to have been able to control her movements against shipping crossing her course, ascending and descending the channel. This her navigators failed to do, and it resulted in part in bringing about the collision.

Sundry assignments of error were made by the vessels, one against the other, and much testimony adduced as to what each vessel did in its operation at and about the time of the collision, but, in the court's view, so far as the same bears upon the collision, it is immaterial and whatever error either vessel committed should be treated as error in .extremis; the real cause being that one vessel was unduly obstructing .the channel, and the other came into the channel at too great speed to avoid collision with the passing car float.

It follows, from what has been said, that a decree will be entered, dividing the damages between the vessels, on presentation.